# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| WALTER ZAWISLAK, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION H-12-2970 |
| | § | |
| MEMORIAL HERMANN HOSPITAL SYSTEM, | § | |
| | § | |
| *Defendant.* | § | |

## MEMORANDUM OPINION AND ORDER (SEALED)[1]

Pending before the court are two motions filed by defendant Memorial Hermann Hospital System ("Memorial"): (1) a motion to dismiss plaintiff Walter Zawislak's complaint (Dkt. 5), and a motion for sanctions (Dkt. 16). The court advised the parties on February 19, 2013, that it was converting the motion to dismiss to a motion for summary judgment pursuant to Federal Rule of Civil Procedure 12(d). Dkt. 14. The court has now considered the motion to dismiss, response, reply, supplemental briefing and evidence, and applicable law, and the court finds that the motion to dismiss should be GRANTED as to Zawislak's claims for corporate malfeasance and violations of the Emergency Medical Treatment and Active Labor Act and that summary judgment should be GRANTED in favor of Memorial on Zawislak's defamation claim. Additionally, the court finds that Memorial's motion for sanctions should be DENIED.

## I. BACKGROUND

Zawislak is a physician who was granted privileges at Memorial Hermann Southeast Hospital ("Southeast Hospital") in April 2008. Dkt. 1; Dkt. 15, Ex. B. Southeast Hospital is a Level III

---

[1] The court has chosen to file this order under seal because some of the information discussed should remain confidential pursuant to 42 U.S.C. § 11137.

Trauma Center.  Dkt. 1.  Zawislak provided emergency medical services to patients at Southeast Hospital as a contractor for TeamHealth.  Dkt. 1; Dkt. 15, Ex. B.  Joseph D'Addesio supervised physicians in Southeast Hospital's Emergency Department who were under contract to provide emergency care, including Zawislak.  Dkt. 15, Ex. B.  Zawislak claims that while he had privileges at Southeast Hospital, from April 2008 through the end of February 2010, he witnessed breeches in on-call physician duties that were in violation of the Emergency Medical Treatment and Active Labor Act ("EMTALA") and resulted in patient deaths.  Dkt. 1.  Zawislak asserts that he filed EMTALA-protected complaints in two of these cases, and that Memorial initiated a professional review action against him in retaliation for reporting EMTALA violations.  Dkt. 1.  Zawislak claims he tendered his resignation in December 2009 and that Memorial did not initiate its investigation of him until February 18, 2010.  *Id.*  Zawislak alleges that Memorial failed to acknowledge various facts relating to problems with the on-call surgeons and nurses with regard to the cases it was investigating.  *Id.*

First, Zawislak claims that he filed an EMTALA-protected complaint regarding an alleged violation of the EMTALA that resulted in the preventable death of a patient, SW, after a different physician, who it appears was the on-call surgeon, was four or eight hours late.[2]  *Id.*  Zawislak asserts that the EMTALA requires hospitals to have policies and procedures to assure the timely arrival of the on-call physician**.**  *Id.*  Zawislak asserts that he was unable to perform surgery on the patient, as he is not a surgeon.  *Id.*  When the surgeon finally arrived, Zawislak alleges that the surgeon was

---

[2] It is not altogether clear from the complaint, but it appears that Zawislak called the surgeon as soon as he determined the patient needed surgery, but the surgeon did not arrive until either four or eight hours after the initial call.  *See* Dkt. 1.

unwilling to perform surgery because the patient did not have insurance. *Id.* The patient allegedly died while in transport to a different hospital. *Id.*

Zawislak notes that Memorial performed a Root Cause Analysis and referred the allegedly tardy surgeon to peer review. *Id.* According to Zawislak, the surgeon was removed from the on-call schedule, referred to the Texas Medical Board ("TMB"), and cited and fined by the TMB, and the order citing and fining the surgeon was posted on the TMB website. *Id.* Zawislak states that the TMB order noted that Memorial "suffered from systemic problems that contributed to this incident and the hospital was cited and fined." *Id.*

After this initial report, Zawislak claims that he filed another EMTALA-protected report when another patient, CD, died after a different on-call surgeon was consulted and asked to assume care of a patient with a stab wound but refused to do so. *Id.* According to Zawislak, this patient likewise did not have insurance. *Id.* The nurse attempted to transfer the patient to Ben Taub hospital, but the accepting surgeon at Ben Taub refused to accept the patient. *Id.* There was no back-up surgeon on call at Memorial. *Id.* The patient allegedly died in transport to a different hospital. *Id.*

Zawislak states that Memorial investigated the death of the second patient, CD, within hours of the patient's death. *Id.* During the course of this investigation, the on-call trauma surgeon allegedly admitted that he was called twice and refused to attend to the patient. *Id.* Zawislak asserts that the surgeon was cited and disciplined, and no longer works at Memorial. *Id.*

A third patient, CC, also allegedly died because an on-call surgeon refused to attend to her, though Zawislak states this patient's preventable death "was not self reported." *Id.* CC's death occurred before CD's and SW's, and Zawislak contends that if Memorial had taken corrective action after CC's death, SW and CD would have had timely surgical interventions. *Id.*

3

According to Zawislak, Memorial conducted a peer review of Zawislak regarding the two aforementioned allegedly preventable deaths and the cardiac arrest and brain injury of a third patient, RJ, but the review "was a review in title only." *Id.* The review "resulted in certain allegations of substandard care by [Zawislak] in spite of overwhelming evidence to the contrary available to the committee." *Id.* According to Zawislak, the committee concluded that Zawislak misread an EKG and failed to diagnose a myocardial infarction that caused RJ's cardiac arrest and brain injury. *Id.* Zawislak contends that medical science definitively excluded myocardial infarction in this patient and that he provided Memorial with hard evidence proving this. *Id.* Zawislak contends the death of this patient was the result of nursing negligence, as the nurses secretly disabled or silenced the alarms in the patient's monitoring devices and did not inform Zawislak about a significant change in the patient's clinical course.[3] *Id.*

Memorial contends that from July 2008 to May of 2009 Zawislak provided medical care to at least six patients in the Emergency Room where his care was later questioned, including the case involving SW that is discussed in Zawislak's complaint. Dkt. 15. A peer review committee investigated Zawislak's care of SW in December 2008 and gave him an "unacceptable" rating. Dkt. 15 & Ex. C. On May 18, 2009, D'Addesio met with Zawislak regarding these issues and wrote him a letter indicating that he was being placed on probation with TeamHealth; this probation continued until the date Zawislak discontinued working at Southeast Hospital. Dkt. 15 & Ex. B. From the date Zawislak was placed on probation until November 30, 2009, Zawislak provided care that individuals at the hospital later deemed to be questionable to four additional patients, including CD. Dkt. 15 &

---

[3] Zawislak asserts that he was cleared off all wrongdoing with regards to the SW case and the CD case by the TMB, but that the TMB had not yet concluded its investigation with regard to the RJ case. *Id.*

Ex. B.  In November 2009, the Director of Healthcare Improvement at Southeast Hospital, Shane Crisp, commenced an investigation of Zawislak's care of CD.  Dkt. 15 & Ex. A.  D'Addesio was part of the investigation commenced by Crisp, but he also commenced a separate investigation, pursuant to his role as Medical Director of the Emergency Department, into Zawislak's care of CD.  Dkt. 15 & Ex. B.  D'Addesio's investigation specifically considered Zawislak's professional competence and conduct regarding CD's care.  Dkt. 15 & Ex. B.  D'Addesio concluded there were serious quality-of-care violations and met with Zawislak on November 30, 2009, to discuss, as D'Addesio felt the violations merited dismissal pursuant to the terms of Zawislak's probation.  Dkt. 15 & Ex. B.  Zawislak, however, told D'Addesio that he intended to resign from TeamHealth in 90 days.  Dkt. 15 & Ex. B.  On December 1, 2009, Zawislak sent D'Addesio an email advising that he would be leaving Southeast Hospital at the end of February 2010.[4]  Dkt. 15 & Ex. G.

On December 9, 2009, while Zawislak continued to practice at Southeast Hospital, the Southeast Hospital Trauma Committee met and considered Zawislak's care of CD as it was presented in the investigations of Crisp and D'Addesio.  Dkt. 15 & Ex. B.  The Trauma Committee determined that further investigation by the Medical Staff Quality Monitoring Committee ("MSQMC") was warranted.  Dkt. 15 & Ex. B.  The MSQMC investigated Zawislak's care of CD on December 16, 2009, and determined that Zawislak's care of CD was "unacceptable" and "inappropriate."  Dkt. 15 & Ex. F.

In the meantime, Zawislak's care of two additional patients were questioned.  Dkt. 15.  One of these patients, RJ, died after suffering a cardiac arrest on or about December 6, 2009.  Dkt. 15 &

_____

[4]  On March 14, 2010, Zawislak submitted an official letter noting that he resigned in February 2010, as the email sent in December 2009 was not considered an official resignation under the hospital's bylaws.  Dkt. 15 & Exs. B, J, K.

5

Ex. H.   The case was referred to a peer review committee, which determined that there was a questionably late diagnosis of acute myocardial infarction.  Dkt. 15, Ex. H.  D'Addesio received the results of the peer review on RJ in early February 2010.  Dkt. 15 & Ex. B.  D'Addesio concluded that these results in conjunction with his knowledge of Zawislak's care of CD and SW as well as other issues indicated that Zawislak's continued work in the emergency room posed an immediate danger to the safety of patients.  Dkt. 15 & Ex. B.  D'Addesio therefore requested consideration of an immediate temporary suspension of Zawislak's privileges.  Dkt. 15 & Ex. B.  D'Addesio presented the request for temporary suspension to the Medical Executive Committee ("MEC") at its February 16, 2010 meeting.  Dkt. 15 & Exs. B, M.  The MEC ordered an investigation of all the prior peer review investigations of Zawislak by the Credentials, Medical and Ethic Committee ("CMEC"). Dkt. 15 & Ex. M.  Pursuant to hospital policy, Zawislak was administratively suspended for fourteen days pending this investigation.  Dkt. 15 & Ex. B.

The CMEC met on February 23, 2010 to discuss Zawislak's record.  Dkt. 15 & Ex. B.  This meeting resulted in a recommendation to the MEC to revoke Zawislak's privileges.  Dkt. 15 & Exs. B, O.  The MEC voted to adopt the CMEC recommendation on February 26, 2010, and recommended revocation of privileges to the hospital board.  Dkt. 15 & Ex. P.  The Chief of Staff notified Zawislak of this decision in a letter on March 8, 2010.  Dkt. 15 & Ex. Q.  Zawislak sent a letter to the chief of staff in which he stated that he resigned in February 2010, and he sent a letter to the peer review committees explaining what he contends happened in each of the cases under review and stating that he felt there was "no need to attend any hearing."  Dkt. 15 & Exs. J, R. Ultimately, the board did not act on the MEC's recommendation to suspend Zawislak's privileges. Dkt. 15.  Instead, on April 13, 2010, Southeast Hospital's board officially accepted Zawislak's voluntary surrender of his privileges as of February 28, 2010.  Dkt. 15 & Exs. B, I.

6

On May 5, 2010, Memorial posted a report (the "NPDB Report") to the National Practitioners Data Bank ("NPDB") noting that Zawislak surrendered his clinical privileges while under, or in order to avoid, an investigation relating to professional competence or conduct. Dkt. 15 & Ex. T. The NPDB Report notes that Zawislak's resignation became effective on February 28, 2010. *Id.* Zawislak claims he submitted his resignation in December 2009 and that Memorial did not even begin its investigations until February 2010. Dkt. 1. Zawislak notified the Secretary of Health and Human Services that he desired to appeal the publication in the NPDB that Memorial took adverse action against Zawislak, claiming that there was an abuse of process, a cover up of the alleged EMTALA violations, and that the action was in retaliation for filing EMTALA-protected reports. *Id.* The Secretary allegedly ordered a comprehensive review and ordered Memorial to provide records. *Id.* Zawislak contends that the records Memorial provided were extensively blacked out and that he never had access to unredacted subpoena materials. *Id.* The Secretary, however, stated that the issues presented in Zawislak's appeal were outside the legal scope of her review. *Id.*

Zawislak contends that he has had a difficult time keeping or obtaining employment because of the NPDB Report. *Id.* He brought this complaint seeking an injunction requiring the removal of the NPDB Report, and asserting claims for corporate malfeasance, nonfeasance, whistleblower retaliation under the EMTALA, and defamation and libel. Dkt. 1. Memorial seeks dismissal of all claims, arguing that the NPDB Report is accurate and that it has already been found to be definitely true after an extensive investigation by the Secretary of the Department of Health and Human Services, who Congress has given authority to determine the accuracy of the NPDB reports. Dkt. 5. Memorial additionally asserts federal immunity against claims relating to the NPDB Report. Dkt. 5. Memorial argues that the NPDB Report is accurate, and its accuracy is an absolute defense to the defamation claim. *Id.* Moreover, Memorial asserts that corporate malfeasance/nonfeasance is not

a cause of action under Texas law, so Zawislak has not stated a claim for which relief may be granted. *Id.* As far as the other actions that allegedly took place during the peer review proceedings, Memorial contends that they are barred by the EMTALA's 2-year statute of limitations and defamation's 1-year statute of limitations. *Id.*

Zawislak responds to the motion to dismiss by providing more factual allegations about the alleged EMTALA violations and how he allegedly was treated unfairly. *See* Dkt. 7. He provides no legal authority or citations and does not address Memorial's legal arguments. *See id.*

The court, in reviewing these filings, determined that many of these issues were better suited for a motion for summary judgment than a motion to dismiss, and it informed the parties that it was converting the motion to dismiss to a motion for summary judgment pursuant to Federal Rule of Civil Procedure 12(d). Dkt. 14. The parties have provided additional briefing and evidence in support or opposition to summary judgment. *See* Dkts. 15, 17. Memorial has also filed a motion for sanctions, arguing that the court should sanction Zawislak for filing a frivolous lawsuit that has no evidentiary support. *See* Dkt. 16.

## II. LEGAL STANDARD

Rule 12(b)(6) allows dismissal if a plaintiff fails to state a claim upon which relief may be granted. FED. R. CIV. P. 12(b)(6). In considering 12(b)(6) motions, courts generally must accept the factual allegations contained in the complaint as true. *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982). The court does not look beyond the face of the pleadings when determining whether the plaintiff has stated a claim under Rule 12(b)(6). *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). In order to survive a motion to dismiss, the complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570 127 S.Ct. 1955 (2007).

8

Under Rule 12(d), a court considering a motion to dismiss pursuant to Rule 12(b)(6) or 12(c) may consider matters outside of the pleadings if it treats the motion as a motion for summary judgment under Rule 56.  Fed. R. Civ. P. 12(d).  If the court decides to treat a motion to dismiss as a motion for summary judgment, all "parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  *Id.*  In this case, the court advised the parties that it was converting the motion to dismiss to a motion for summary judgment and gave the parties ten days to supplement the record.  *See* Dkt. 14.

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c)); *see also Carrizales v. State Farm Lloyds*, 518 F.3d 343, 345 (5th Cir. 2008).  The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; there must be an absence of any genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S. Ct. 2505 (1986).  An issue is "material" if its resolution could affect the outcome of the action.  *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007).  "[A]nd a fact is genuinely in dispute only if a reasonable jury could return a verdict for the non-moving party."  *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).

The moving party bears the initial burden of informing the court of all evidence demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986).  Only when the moving party has discharged this initial burden does the burden shift to the non-moving party to demonstrate that there is a genuine issue of material fact.  *Id.* at 322.  If the moving party fails to meet this burden, then it is not entitled to a summary

judgment, and no defense to the motion is required.  *Id.*  "For any matter on which the non-movant would bear the burden of proof at trial . . . , the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial."  *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718–19 (5th Cir. 1995); *see also Celotex*, 477 U.S. at 323–25.  To prevent summary judgment, "the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986) (quoting Fed. R. Civ. P. 56(e)).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant and draw all justifiable inferences in favor of the non-movant.  *Envl. Conservation Org. v. City of Dallas, Tex.*, 529 F.3d 519, 524 (5th Cir. 2008).  The court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence; disregard all evidence favorable to the moving party that the jury is not required to believe; and give credence to the evidence favoring the non-moving party as well as to the evidence supporting the moving party that is uncontradicted and unimpeached.  *Moore v. Willis Ind. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000).  However, the non-movant cannot avoid summary judgment simply by presenting "conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation."  *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  By the same token, the moving party will not meet its burden of proof based on conclusory "bald assertions of ultimate facts."  *Gossett v. Du-Ra-Kel Corp.*, 569 F.2d 869, 872 (5th Cir. 1978); *see also Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1221 (5th Cir. 1985).

10

### III. ANALYSIS

In its motion to dismiss, Memorial argues that Zawislak does not state a claim for relief for corporate malfeasance or nonfeasance because no such cause of action exists in Texas and that he fails to state claims for EMTALA violations and defamation because the statutes of limitations for those claims have already expired. Dkt. 5. It also asserts that federal immunity and the accuracy of the NPDB Report defeat Zawislak's defamation claim. *Id.* In its supplemental briefing after the conversion to a motion for summary judgment, Memorial asserts that Zawislak was under investigation when he submitted his resignation and when the resignation became effective, which triggered its obligations to submit the NPDB Report, and that the NPDB Report is truthful. Dkt. 15. As discussed below, the court finds that Zawislak's complaint fails to state a claim for EMTALA violations or corporate malfeasance or nonfeasance and that summary judgment should be granted in Memorial's favor on Zawislak's defamation claim.

### A.      Corporate Malfeasance/Nonfeasance

Memorial argues that Zawislak fails to state a claim for corporate malfeasance/nonfeasance because corporate malfeasance or nonfeasance is not a tort in Texas. Dkt. 5. Zawislak fails to address this argument in his response. *See* Dkt. 7. The court has found no cases in Texas in which corporate malfeasance or nonfeasance are asserted as causes of action. Memorial's motion to dismiss the corporate malfeasance/nonfeasance claim is GRANTED.

### B.      EMTALA Claims

"Congress enacted EMTALA 'to prevent "patient dumping," which is the practice of refusing to treat patients who are unable to pay.'" *Battle ex rel. Battle v. Mem'l Hosp. at Gulfport*, 228 F.3d 544, 557 (5th Cir. 2000) (quoting *Marshall v. E. Carroll Parish Hosp.*, 134 F.3d 319, 322 (5ht Cir. 1998)). Under the EMTALA, a hospital that has an emergency department is required to provide

11

"an appropriate medical screening examination within the capability of the hospital's emergency department." 42 U.S.C. § 1395dd(a).  The hospital may transfer the patient to another hospital only if the individual requests the transfer, the treating physician signs a certification that the medical benefits of treatment at another facility outweigh the risks of transfer, or, if a physician is not available at the time the individual is transferred, a qualified medical person who has consulted with a physician determines that the benefits outweigh the risks, and the transfer is an "appropriate transfer." *Id.* § 1395dd(c)(1).  An "appropriate transfer" is one in which, among other things, the transferring hospital provides treatment to minimize the risk of transfer; the receiving facility has space available, personnel qualified to treat the individual, and has agreed to accept the transfer; and the transferring hospital provides the receiving hospital with the medical records and other pertinent information.  *Id.* § 1395dd(c)(2).  Part of the required information the transferring hospital must provide is "the name and address of any on-call physician . . . who has refused or failed to appear within a reasonable time to provide necessary stabilizing treatment."  *Id.*  Violations of these provisions may be enforced by individuals who suffer personal harm as a result of the violations or medical facilities that suffer a financial loss as a result of the violations.  *Id.* § 1395dd(d)(2).  The statute has a two-year statute-of-limitation.  *Id.*  Congress expressly noted that the statute does not preempt state or local laws unless there is a direct conflict.  *Id.* § 1394dd(f).  Participating hospitals may not penalize or take adverse action against a physician for reporting a violation.  *See* 42 U.S.C. § 1395dd(j).

Zawislak alleges that Memorial penalized him for reporting EMTALA violations by making adverse decisions against him during the peer review process and reporting to the NPDB that Memorial had accepted Zawislak's resignation while he was under investigation.  Dkt. 1.  However, Zawislak filed his case on October 4, 2012.  Dkt. 1.  According to Zawislak's complaint, Memorial's

12

CMEC recommended adverse action against Zawislak's credentials on February 18, 2010 and reported him to the NPDB in April 2010. Dkt. 1. Zawislak allegedly tendered his resignation in December 2009. *Id.* All of these events occurred more than two years before Zawislak filed this action. Any claims relating to these events are thus barred by the two-year statute-of-limitations.[5] Memorial's motion to dismiss Zawislak's EMTALA claims is therefore GRANTED, and Zawislak's EMTALA claims are DISMISSED WITH PREJUDICE.

**C.     Defamation**

Zawislak's defamation claim is based on the NPDB Report. *See* Dkt. 1. Under the Health Care Quality Improvement Act, 42 U.S.C. § 11101 *et seq.*, if a health entity accepts the surrender of clinical privileges of a physician "while the physician is under an investigation by the entity relating to possible incompetence or improper professional conduct," the health entity must report the name of the physician, a description of the reason for the surrender, and any other information the Secretary of Health and Human Services deems appropriate, to the Board of Medical Examiners. 42 U.S.C. § 11133(a).

Memorial argues in its motion to dismiss that Zawislak's defamation claim must fail because there is a one-year statute-of-limitations for defamation claims under Texas law. Dkt. 5. Under Texas law, a "person must bring a suit for malicious prosecution, libel, slander, or breach of marriage not later than one year after the date the cause of action accrues." Tex. Civ. Prac. & Rem. Code Ann. § 16.002(a). Zawislak bases his defamation claim on the publication of a written statement to the

---

[5] Memorial notes that it did re-file the NPDB report on October 7, 2011—which is within the statute-of-limitations—to correct a clerical error. Zawislak calls this re-filing a "revision" in his complaint, but he does not allege that there were any new substantive assertions in the October 7, 2011 re-filing. Indeed, a review of the initial and corrected versions demonstrates that Memorial simply changed the "date action was taken" from April 8, 2010 to April 13, 2010. *Compare* Dkt. 5, Ex. A, *with* Dkt. 15, Ex. T.

NPDB, which he contends took place in April 2010, but he did not file this lawsuit until October 4, 2012. Thus, the statute of limitations has run on the defamation claim as it pertains to the original publication to the NPDB.

Zawislak contends in his complaint, however, that the statement is "republished" every time there is an inquiry regarding Zawislak's medical credentials. Dkt. 1. He also notes that Memorial published a revision on October 7, 2011, which is within the one-year statute-of-limitations. *Id.* Since the alleged defamatory statement was, according to the allegations in the complaint, re-published within a year of Zawislak filing his complaint, the motion to dismiss on statute of limitations grounds is DENIED.

However, the court finds that summary judgment is appropriate on the defamation claim because the NPDB entry is substantially true, and the portion of the entry that Zawislak contends is untrue is not defamatory. The NPDB Report states:

> Physician was an emergency medicine practitioner at this hospital. He tendered a vague resignation in early December of 2009 to be effective "the end of February 2010." Concurrently, a request for corrective action was opened related to clinical judgment and patient care issues. The resulting recommendation to revoke clinical privileges was pending when the resignation date became effective. He did not exercise his due process rights.

Dkt. 15, Ex. T. Zawislak first contends that the resignation he tendered in December 2009 was not vague. The email in December 2009 states, "I'll be leaving at the end of February 2010 to open Seint Micheel's urgent Care Center." Dkt. 15, Ex. G. The letter clearly indicates that his resignation was effective at the end of February 2010. The court does not believe that the statement to the NPDB that the resignation letter is vague is defamatory.[6] Under Texas law, in order to maintain a

---

[6] It appears the hospital considered the November email to be a "vague" resignation because the hospital policy required a formal letter. *See* Dkt. 15.

defamation cause of action, a plaintiff must show that the defendant "(1) published a statement; (2) that was defamatory concerning the plaintiff; (3) while acting with either actual malice, if the plaintiff was a public official or public figure, or negligence, if the plaintiff was a private individual, regarding the truth of the statement." *WFAA-TV, Inc. V. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998). "Whether a publication is capable of defamatory meaning is initially a question for the court." *Turner v. KTRK Tele., Inc.*, 38 S.W.3d 103, 114 (Tex. 2000). "A statement is capable of defamatory meaning if it is both false and injurious to the reputation of the person about whom it is made." *Miranda v. Byles*, 390 S.W.3d 543, 573 (Tex. App.—Houston [1st Dist.] 2012, pet. filed). The assertion that the letter of resignation was "vague" is not injurious to Zawislak's reputation as a physician.

The remainder of the NPDB Report is true. Zawislak concedes that the statement made by Memorial that "Dr. Zawislak voluntarily surrendered his clinical privileges while under, or to avoid, investigation," "might by plausible if EMTALA violations were not an issue, if Plaintiff did not submit EMTALA Protected Reports (EPA), if fatalities did not result of violations of the Act, if liability from medical malpractice was not an issue, if US OIG sanctions were not a real possibility, if [Memorial] did not deviate from normative behaviors required of hospital licensees with JC accreditation and CMS contracts holders, if JC accreditation was not at risk, if Plaintiff failed to meet the Standard of Care (SOC), if [Memorial] did not **complete** and **close** investigations of [the surgeons involved in the EMTALA violations] prior to 11/17/2009." Dkt. 17. Zawislak contends that the investigation was "bogus" because there was "no substance to any of the charges brought against Plaintiff, they were trumped up." *Id.* He claims he resigned on December 1, 2009, that the Managing Executive Committee approved his resignation on January 17, 2010, and that the CEO approved his resignation on January 17, 2010. *Id.* He states that there was never mention of an

15

investigation.  *Id.*  He also indicates that the cases at issue were already formally closed at the time

that Memorial states its investigation began.  Dkt. 17.

Zawislak does not attach an affidavit to his response, and he does not attach any evidence.

Under Rule 56 of the Federal Rules of Civil Procedure, a "party asserting that a fact cannot be or is

genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the

record, including depositions, documents, electronically stored information, affidavits or

declarations, stipulations (including those made for purposes of the motion only), admissions,

interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the

absence or presence of a genuine dispute, or that an adverse party cannot produce admissible

evidence to support the fact."  While the court could rely on other evidence in the record indicating

that some of the investigations discussed in Zawislak's complaint had concluded, Zawislak does not

provide any evidence indicating that there was no pending investigation at the time his resignation

became effective.  Moreover, his assertions that the investigation was bogus and trumped up are

inconsequential to the court's analysis of whether the report, which Memorial had to file if it had an

open investigation at the time of Zawislak's resignation, is true.

The evidence Memorial submitted demonstrates that there was an ongoing investigation

when Zawislak's resignation became effective on February 28, 2009.  D'Addesio states that in early

February 2009, he received the results of the initial hospital and peer review investigations of

Zawislak's care of RJ, a patient to whom Zawislak allegedly provided questionable care at Southeast

Hospital after December 1, 2009.  Dkt. 15, Ex. B.  D'Addesio then drafted a request for corrective

action with regard to this case on February 15, 2010, and presented the request to the MEC on

February 16, 2010.  *Id.*  At this time, the MEC charged the CMEC with conducting a follow-up

investigation into all of the prior peer review investigations of Zawislak.  *Id.*  The CMEC met on

16

February 23, 2010, and recommended revoking Zawislak's privileges. *Id.* The MEC met on February 26, 2010, and voted to adopt the CMEC recommendation. *Id.* The hospital board, however, never acted on this recommendation because when it met on April 13, 2010, it decided to instead accept the voluntary surrender of Zawislak's privileges as of February 28, 2010. *Id.*

An "investigation is ongoing . . . until a health care entity makes a final decision or formally closes the probe, even if the entity is no longer gathering facts but is merely deliberating about what course of action it should follow." *Doe v. Leavitt*, 552 F.3d 75, 79, 86. Here, the final decision of the board was not made until after Zawislak's resignation was effective. Thus, the investigation was ongoing. Memorial had a duty to report Zawislak's resignation to the NPDB, and the report was substantially true. Memorial's motion to dismiss the defamation claim, which the court has converted to a motion for summary judgment, is therefore GRANTED.

## IV. MOTION FOR SANCTIONS

Memorial requests that the court impose sanctions on Zawislak pursuant to Federal Rule of Civil Procedure 11. Under Rule 11, when a party signs a pleading it certifies that to the best of the signing party's knowledge, the pleading is not, among other things, frivolous and that the claims have evidentiary support or likely will have evidentiary support after discovery. Fed. R. Civ. P. 11(b). Memorial contends that this is Zawislak's second lawsuit alleging that the NPDB Report is defamatory, that the lawsuit is frivolous and devoid of factual support, and that Zawislak knew this because he filed a voluntary notice of dismissal of the first complaint, which was filed in state court and had essentially the same claims, after the Secretary of the Department of Health & Human Services determined that the NPDB Report was accurate and appropriately submitted. Dkt. 16.

In the Fifth Circuit, "Rule 11 liability is assessed only for a violation existing at the moment of filing," which is known as the "snapshot" rule. *Skidmore Energy, Inc. V. KPMG*, 455 F.3d 564,

570 (5th Cir. 2006). Rule 11 compliance is measured by an objective standard of reasonableness under the circumstances. *Thomas v. Capital Sec. Servs., Inc.*, 836 F.2d 866, 873 (5th Cir. 1988). District courts have discretion in determining whether or not to apply sanctions under Rule 11. *See* Fed. R. Civ. P. 11© (stating that "the court *may* impose an appropriate sanction" (emphasis added)); 5A Charles Alan Wright et al., Federal Practice and Procedure § 1336.1 (3d ed. 2004) ("The 1993 amendment to Rule 11 returned the imposition of sanctions to the discretion of the district judge."). District courts that elect to impose sanctions must impose the "least severe sanctions adequate to accomplish the purpose for which the sanction was imposed." *Topalian v. Ehrman*, 3 F.3d 931, 938 (5th Cir. 1993). Courts should consider the following factors when determining whether to impose Rule 11 sanctions:

> Whether the improper conduct was willful, or negligent; whether it was part of a pattern of activity, or an isolated event; whether it infected the entire pleading, or only one particular count or defense; whether the person has engaged in similar conduct in other litigation; whether it was intended to injure; what effect it had on the litigation process in time or expense; whether the responsible person is trained in the law; what amount, given the financial resources of the responsible person, is needed to deter that person from repetition in the same case; what amount is needed to deter similar activity by other litigants.

Fed. R. Civ. P. 11, 1993 Advisory Committee Notes.

Memorial argues that Zawislak, though pro se, is a sophisticated party who completely disregarded the evidence and the outcome of the former lawsuit and his obligations to this court under Rule 11. Dkt. 16. The court is, however, not convinced that Zawislak should be considered a sophisticated party who understood the legal intricacies involved when he filed his complaint in federal court. While certainly he has advanced academic training in *medicine*, a quick review of his complaint and legal pleadings in this case reveals that he is unversed in the law. Moreover, he

18

claims he has had a difficult time keeping or obtaining employment due to the issues about which he complains in his complaint, so his financial resources may be limited.  *See* Dkt. 1.  Additionally, Zawislak contends that he re-filed his case because of new evidence not available during the first case.[7]  Dkt. 17.  Thus, while the court believes, as is evidenced by its dismissal of this case, that Zawislak's claims lack merit, it does not believe Rule 11 sanctions are appropriate.  Accordingly, Memorial's motion for sanctions is DENIED.

## V. CONCLUSION

Memorial's motion to dismiss (Dkt. 5) is GRANTED as to Zawislak's claims for corporate malfeasance and violations of the EMTALA, and summary judgment is GRANTED in favor of Memorial on Zawislak's defamation claim.  All of Zawislak's claims are hereby DISMISSED WITH PREJUDICE.  Memorial's motion for sanctions (Dkt. 16) is DENIED.

Signed at Houston, Texas on April 3, 2013.

_____
Gray H. Miller
United States District Judge

---

[7] Zawislak's new evidence does not support his defamation claim.  It may have been relevant to the alleged EMTALA violations if there were not a statute of limitations problem.  *See* Dkt. 17 (alleging that Zawislak discovered, after non-suiting Memorial, that Memorial withheld an exculpatory report from Zawislak's peer review committee and that Memorial redacted statements in documents that pointed to EMTALA violations by Memorial and its on-call surgeons).